Case No. 22-1918 from Eastern Arkansas, United States v. Andrew Pierson. Ms. Depper, when you're prepared, please proceed. Chief Judge, and may it please the Court, Annie Depper representing the appellant, Andrew Pierson. In our brief, we've presented, I believe, five arguments on appeal. Today, I'm going to focus primarily on two arguments that I think are really at the central, at the heart of this case. The first one, Your Honors, goes to our motion to suppress evidence. And in that motion, we requested that the District Court suppress evidence that was taken from Mr. Pierson's vehicle, taken from Mr. Pierson's residence. We asked the Court that it would apply the Fourth Amendment exclusionary rule. And so this is my first, and I think one of my primary arguments. As this Court is aware, the constitutional rights of Americans do not generally extend to foreign searches and seizures on American citizens. But there are two exceptions to that rule. The first exception is when the actions of the foreign authorities shock the judicial conscience. And the second is when there is evidence of a joint venture between the foreign authorities and the American authorities. Have we recognized either of those exceptions in this circuit? I know other circuits have. Your Honor, at this point, no. I could not find any case in which the Eighth Circuit has actually affirmed that those are two exceptions. The cases that we cite here are an Eleventh Circuit case, the Emanuel case. We also have the Valdiva case, as well as the Stokes case. I know Stokes is out of the Seventh Circuit. So it has been addressed by other circuits and accepted by other circuits. I just haven't seen that issue before this Court. Well, and to follow up on that, you're right that other circuits have addressed it, but they're kind of all over the board. I want to say that one circuit accepts the shock to judicial conscience, but not the joint venture. Another one accepts joint venture, but not shock to the judicial conscience. So there doesn't seem to be a lot of agreement on what exactly the contours of the exceptions are. And, Your Honor, when I read those lines of cases, I understand what you're saying. There are some that go shock to judicial conscience. It doesn't seem that they reject joint venture. They just don't address it. Right. And so the closest that I could get to was Emanuel and I think the Valdiva case, as well. And those specifically bring in those two exceptions. But there are other cases, and they — but I think as I read those, it's not a rejection of the other option. It's just that circuit is embracing shock to the judicial conscience or joint venture, Your Honor. And I would say that either way we go, we contend that, first, the actions of the Mexican authorities were sufficient to shock the judicial conscience. And, second, if we're going down the road of joint venture, we believe there was sufficient evidence to demonstrate that there was a joint venture between the Mexican authorities and the American people. So, first, on the shock to conscience, the allegations of the conduct of the Mexican authorities are — do outline egregious behavior. But what is there corroborative of that conduct other than the testimony of Mr. Pierson? Your Honor, I think we've got two lines of evidence that would corroborate the testimony of Mr. Pierson. And one is — and, again, these are statements that he made, but statements that he made outside of court. They were statements that he made during his interrogation by Agent Roldan and Agent Bocanegra. In those statements, he was talking about the — what the Mexican authorities did to him, picked him up early in the day, drove him around in the back of a truck, didn't get into specific physical assault or anything like that. But some of what he was saying was corroborated by his statement in his interrogation. We also have, Your Honor, the medical records. And I understand the government's position on that. The government's position is, well, if he was tortured, if he went through all this physical abuse, surely there would be something else in those medical records. And I agree, there's not a ton there, but there is an indication that he did have a contusion in his back. He testified that he had been kicked in his back. But I would also like the court to be aware that when he does go to the hospital on that day — Were there any head injuries or some of the other injuries that were described as — that would seem to have produced some physical evidence? They did not note that in the medical records, Your Honor. But I was going to state that he was there for a heart issue. He had passed out, fallen on the floor at Webb County Jail. When he arrived at the hospital, he was describing symptoms of weakness, weak heart, things like that. And so really the focus of the medical personnel was addressing a heart issue. And so I don't see from the medical records that they did a head-to-toe examination of Mr. Pearson. But I will admit that the only thing that is in those medical records addressing or corroborating any of his statements was the issue of a back contusion. On the standard itself, shock to judicial conscience, I have trouble figuring out exactly what that is. I know the court's — in another context, and I'm wondering if this is what you would propose that we adopt or urging us to adopt, which is the substantive due process type of inquiry on executive officials who act outrageously. Is that — is that what that means or does it mean something?  Well, I think we get to — I think the Mitro case or the Mitro case really gives us the road to go down or what the definition would be of shock to judicial conscience. And in that, it looks at two things, right? It looks at conduct that violates notions of United States due process. But then in addition to that, so it's that plus, we also have it violates fundamental international norms of decency, which I get is kind of a broad category. Yeah, that sounds different than substantive due process. It does. It does. And so I think it's a little bit of due process plus, right? What are courts doing around the world? What are other countries doing with respect to due process rights, et cetera, et cetera? And so in our brief, what we did was try to identify for the court, listen, this is what U.S. due process requires. We went down that road, arrest warrants, search warrants, et cetera. But then we got to get to the plus, right? It's one thing to violate U.S. norms of due process. That's not sufficient for me to shock the judicial conscience. What I've got to do is meet that additional burden. And I think we did by citing to the Mexican Constitution. It was specifically Article 16. Article 16 requires much of what the U.S. courts require. It requires an arrest warrant to be issued by a judicial or competent authority. It also requires a search warrant to be issued by a competent authority. And that search warrant has to describe the place to be searched and the items that they are looking for. And so we know, like the U.S., the Mexican Constitution provides similar rights, similar requirements, similar due process. We also cited to laws from other countries around the world in an attempt to hit that international norms of decency. And I'm trying to kind of tie it into due process. But if we look at other countries around the world, they often have similar or same requirements. In order to detain someone, to seize someone, what you have to have is an arrest warrant. In order to go into their home or go into their vehicle or go into their privacy, you have to have a search warrant. In addition to that, trying to hit that U.S. notions of due process plus, I went down the road of what do international courts require, what do international treaties require. And we specifically talked about the ICCPR. And in that, that also respects individuals' liberty, which would protect them against certain detentions or detentions without an arrest warrant. And it also provides for privacy in the home, which I think really is at the heart of search warrants before going into someone's privacy. Well, I wanted to ask about the joint venture quickly, too, because that one actually, I think I understand it. It makes sense to me, which is that you have United States officials acting when they're in a joint venture with foreign officials. In other words, you can attribute state action in a way you maybe couldn't if it was the Mexican officials acting alone. But the problem I'm having, and I want you to tell me if I'm wrong about this, is that it seems like the Mexican officials kind of shut the government, federal government, our federal government agents out. There was information sent to the Mexican officials to locate Pearson. But when they wanted to go and participate in the search, they said, no, you're not coming, you're not participating. They did send things on the back end. But that doesn't look very much like a joint venture. And so, Judge Cross, you're right. And that's something that the government relies on is listen with regard to the second search. The Mexican Attorney General's Office conducted that search. USMS asked to be involved, and they were rejected. But, Your Honor, I think there's also evidence that demonstrates that possibly even so, there was still a joint venture. Even so, the Americans were making requests and directing or asking the Mexicans to do certain things. And, Your Honor, that evidence is really two things. First, we know from Deputy Sanchez's testimony, when he took the stand, he was talking about what HSI and CBP were doing. He said CBP made requests of the Mexican government. And he said that, as he understood it, the first search, we had two searches. We had one on November 27th of 2018. That was the search of Mr. Pearson's mechanic shop. And he indicated, Deputy Sanchez indicated, CBP requested that search. Now, that search was conducted by Mexican officials, but at the request of American officials, at the request of CBP, not the U.S. Marshals, CBP. So we know there's already been one search that was done by Mexican officials at the request of American authorities. When you get to that second search, Your Honor, you are correct that that was not done by American authorities. Americans were not involved in that search.  But, Your Honor, and I think that, first, Deputy Sanchez testified that he, with the U.S. Marshals Service, asked to take part, right? Different than CBP. It's a different agency. And he was rejected in his request to take part. But, Your Honor, I think logic will dictate here that U.S. authorities requested that first search. Mexican authorities conducted it at their request. So do we have to then apply fruit of the poisonous tree to get at the second search? I mean, expand it to a foreign search? I don't think it would be fruit of the poisonous tree, Your Honor. I think we're dealing with, when we're talking about joint venture, these two separate searches. That first search, I'm not aware of evidence coming out of that and impacting Mr. Pearson's case. The big issue was the second search. And so I don't think it's fruit of the poisonous tree necessarily, but it's going, trying to understand how this worked, right? How did this second search occur? And finally, on that issue, Your Honor, there was also evidence that the, with regard to the second search, that that search was conducted. He was arrested on December 10th. That search was conducted on December 13th, 2018. And so it also seems like Mr. Pearson's out of the country, right? This is a search of his residence, search of his residence when he's already gone. What do the Mexican authorities want with the things in Mr. Pearson's residence? Now, certainly there's some, there's argument and it's been established that he was involved in some cartels, but this is his residence. Do they need evidence against Mr. Pearson? No. Who did need evidence against Mr. Pearson? The U.S. government needed evidence against Mr. Pearson. So it's asking that we look at all of this evidence in its totality and go, well, really that second search, although the U.S. government is saying we had nothing to do with it, the evidence demonstrates that likely they did, Your Honor. I'd like to move on from that. I think there is sufficient evidence to demonstrate shocking the judicial conscience. Even if you take out the torture, we've got the issue of arrest without a warrant, multiple searches without warrants. I think that would get us there when looking at the standard that shocks the judicial conscience. We also have enough evidence of joint venture. Your Honor, the second argument that I wanted to address comes to the sentencing of Mr. Pearson. And I think this is a primary issue in this case. And we submit that the judge committed both procedural error and substantive error in his sentencing of Mr. Pearson. I think perhaps the most significant procedural error that was committed by the district court is that the district court based his sentence, if you read that entire transcript of the sentencing hearing over and over and over again, we come back to the same issue. The issue that the judge was relying on, the district court was relying on, that the government continued to come back to, is that these firearm parts, again, remember, 100 to 200 firearm parts imported by Mr. Pearson in New Mexico over a multiyear period. These firearm parts would then be used to repair firearms for the cartels. And what did the cartels do? They kill innocent people. They kill police officers. They kill other cartel members. And they came back to this over and over again with no evidence that those parts, and I think it's important we've got to bring this case in to what we can that's concrete, and it's about these firearm parts that were going into Mexico. There was no evidence linking the firearm parts that Mr. Pearson brought into Mexico to the deaths of anyone. Well, he did admit that they were provided to the cartel, didn't he? He did admit that he was repairing firearms for the cartels, yes, Your Honor. So what was missing is just what the cartel did with the specific guns. And I would say with the specific firearm parts, the part that the gun was in, right? This isn't a case of Mr. Pearson bringing in fully functioning firearms. There's no evidence of that. It's just these parts. And so, Your Honor, I think it's too much of a leap to move forward to go, well, these parts caused the death of innocent civilians. Well, the district court didn't attribute any particular deaths to these parts  He did not, Your Honor. And there wasn't evidence of that. So it's hard to say that the court specifically was trying to sentence him for someone's homicide. And I certainly understand that, Your Honor. But I think that's why I say when you read the sentencing transcript in its entirety, although the court says there's just not evidence of it, the court continues to go back to it over and over and talk about his concerns about innocent civilians. The court did reference other 3553A factors in the sentencing that it was taking into account all of the relevant factors. He did, Your Honor. The court did. And, Your Honor, with that, I'll reserve my last seven seconds, if I may. Thank you, Ms. Deffer. Sorry I didn't step in and remind you about your time. No, that is just fine. Ms. Gardner. Good morning. May it please the Court. I'm Anne Gardner, and I'm representing the United States this morning. In this case, Ms. Deffer did outline two major issues, and then the third, which is the sentencing, the two major issues, first being whether they're challenged to jurisdiction in general under the Kerr-Frisbee doctrine, and then the Fourth Amendment issues on the exclusionary rule. If I may, I would like to start with the Fourth Amendment issue, as she did. She's really conflating what is happening between disparate and desperate government agencies in this investigation. There's a series of different things going on. There's an investigation to where Mr. Pearson is and an investigation to what he's doing. And the U.S. Marshal Service was specifically looking for Mr. Pearson and coordinating with the Mexican government. The other investigation had no coordination with the Mexican government. We have the one instance where the Customs and Border Patrol went out on their own and passed a lead for the auto shop. We're not even using any evidence from the auto shop. All they did was pass a lead, and under the case law, passing information to which a foreign government acts is not a joint venture for application of the exclusionary rule. On the second search, Ms. Depper wants to speculate that the American government put that search in motion of his residence. The factual matter of that is that the American government was surprised that the Mexican government was going to search his residence because the Mexican government called the ATF and said, as a courtesy, we know you're the firearms liaison here. We're going to search this residence as part of our case. And then AHSJ asked, may I go, and they said no. That was completely done at the Mexicans' own notice, at their own volition, because they had an open case on the cartels, and that was the place. One of the other things is that we are supposing that everything that happened in Mexico actually violated Mexican law. And there's no evidence in the record that that actually happened. There was one document we were able to procure. We were not able to use because of the MLAC. Would it have to violate Mexican law in order to constitute something that could shock the conscience of an American judicial system? Yes, Your Honor. I believe that you do, because we are not in control of what other countries do under the application of their laws, especially with the exclusionary rule. It has no force and effect as to what they're going to do. It is meant to keep control of our own officials in abiding under the Constitution and for fairness in cases that we present. The Mexican government is not affected by the exclusionary rule, and as a matter of fact, the warrants clause under the Fourth Amendment, we can't even get an extraterritorial warrant. So whether or not they got a warrant for that residence, whether or not there was exigent circumstances and they went into that residence, same thing with the traffic stop. We're supposing that that traffic stop was illegal. There's no evidence in the record that it was illegal. Did the government sort of dodge a difficult issue when the Mexican government said no? Because I wonder whether if a U.S. Marshals Service official actually accompanied the Mexican law enforcement on that search, whether we would be having an entirely different discussion. We may, depending upon how active they were in the search of that residence. But the facts of the matter is that we did not participate and we were not allowed to participate, which makes the applications of the exclusionary rule fairly simple in that case. As to the shocking the conscience, a due process violation, none of the cases that go into the analysis of shocking the conscience really go into it's just a due process violation. That is enough to shock the conscience. It's that international, fundamental international norms of decency. And the case law that really addresses that goes into what happened to the person there. Were they held? Were they tortured? Were they, you know, did they, what kind of abuse did they suffer at the hands of the country? Counsel, if the allegations made by Mr. Pearson were founded and factually credible and believed, would they constitute conscience shocking behavior? Under the case law that has been decided, no, Your Honor. I don't believe even if the torture, what he says was torture, could be substantiated that what happened over a 12-hour period of time and then he was released to the United States and the injuries that he bore out were not shocking the international conscience. The cases that we have are where people are tortured over a period of time, they're strapped to a bed, they're electrocuted, they're beaten, they're held for months at a time and finally turned over. This was not something that happened. He was taken by the Mexican police and he was put in the back of a truck, he was cold, he was driven to the border and he was escorted across. And the Mexican government has the ability to extricate or to expel people that are U.S. citizens. There was an active fugitive warrant, they knew that. He was invited to go across to the United States. Now, he said he did not self-surrender, but there's no evidence in the record one way or the other whether he voluntarily walked across that bridge or whether the Mexican government surrendered him to the U.S. Related to the Chief's question, it appears that the Kerr-Frisbee Doctrine also has a shock the judicial conscience component to it as well. In fact, that seems to be a key part of the exception there. Is it the same shock the conscience test as under the exclusionary rule or are we talking about different things there? The facts seem to be very, very similar. The shock to the judicial conscience in the jurisdiction question under the Kerr-Frisbee Doctrine, they came back from the Kerr-Frisbee Doctrine saying we don't really care what happened overseas, you have jurisdiction here anyway. So they came back with Toscanino that backed that back a little bit, but it's the defendant's burden to show that the action was taken by or with the knowledge of the American government. And that was further distinguished by Lira where they said there's no vicarious liability for that either. You've really got to show that, you know, the American government knew about it, the American government was a party to it. The reason why I'm asking the question, incidentally, is if they're very similar, then I think we have to decide whether to adopt the shock to judicial conscience test in this circuit because we have it coming up twice and it would be really, I think, hard to assume without deciding. Maybe I'm wrong about that, but there's a lot. It seems to rear its ugly head a couple of times. It does, Your Honor. And in the cases that use them both, they do address them both. The cases that only address one, the facts lead more to addressing one than the other. Maybe there wasn't any allegation of any physical abuse or there wasn't any allegation of all of joint venture or the government conceded, yes, we were in a joint venture, but this is why it doesn't apply. So that's kind of how the cases shake out in all the circuits. Here she is raising both questions. Both questions probably appropriately be addressed. And moving on to the question about the interview, the United States would rest on the audio tape of that interview, and I think it's determinative the demeanor of the defendant when he's being interviewed for two hours by the agents. He's a willing participant. His main concern is you've picked me up in the middle of the day and now I'm not going to be able to cooperate as well. That was one of his main concerns. He was all in about cooperating. He had a discussion with them where he went into detail about all his escapades with the cartels, how he fixed their automatic weapons, how he went up in the hills to meet with the leaders of the cartel because he was the guy they were going to call. He was the guy that could fix the guns for them. And he went on at length, often joking with the agents, relaxed, not exhibiting any kind of physical or emotional distress. Did he complain at all about his physical condition or physical treatment during that interview? The only thing he said at the beginning is, I've been waiting for you guys a long time, I'm cold, I'm dressed in a T-shirt and shorts, I've got bad circulation, my hands are turning blue, I'm supposed to get health treatment. And they said, yes, we're going to see to your health treatment. You have to recognize at this point Mr. Pearson was 510 pounds and he was in very, very poor health and he has severe edema. And that is really what sent him to the hospital that night. And he was treated and released. He wasn't kept for any other kind of observation or any kind of serious condition. But he really wanted to cooperate. That was his focus at that time. And over a two-year period when he found out that I can't talk my way out of this offense, then he made up the story about the torture. And he had a two-year period in the jail to think about that. And so it's fanciful, it's fabricated, and it's not supported in the record. If a 510-pound man had gone to the hospital, they would have looked him over and he would have had more than one contusion on his back. If he had been drug on the ground and kicked, knocked unconscious with a rifle butt, there was no blood on his head. We introduced a picture of him as soon as he came across the border with the CBP. There's no signs of bruising or scraping or having been knocked unconscious. The CBP officer testified, I saw him, I didn't see anything on him. I do this for a living, and when people are tortured, that's the first thing they tell me. And he made no indication to that officer or any of the other officers that night. So there's nothing other than his statements in the record. And the district court, in making its ruling, did not believe the defendant and disregarded that testimony. And the final issue of the sentencing, there are really no other use for the parts that Mr. Pearson took across the border than to make firearms for the cartels. And the cartels kill people. That's what they do. They defend their drug territory. They defend their political territory. To say that there was some kind of attenuation between, I'm going to fix an automatic weapon for the cartels and endangering the community to the extent that he did in Mexico, there isn't any argument for that. To say that he was doing something completely innocent or to say that it may have even had some kind of alternative aspect in Mexico. Citizens, our ATF agent testified that citizens cannot own these kinds of weapons. They cannot own firearms. So there was no legitimate avenue for what he was doing. And he admitted himself that he did this for the cartels. It's well known what the cartel violence was. There was testimony in the record of what the cartel violence was at that time. And the court could make that inference that what Mr. Pearson was doing was so serious that it did result in the death of others. For those reasons, we do not believe that he committed procedural error, nor that there was a substantive error in the sentence, given the kind of case it was and the impact that Mr. Pearson had in Mexico. If there are no further questions, I'll yield my time. I don't see any. Thank you. Thank you, Ms. Gardner. Ms. Depper, we'll give you a minute. Thank you, Your Honor. I just want to touch on my final argument with regard to the sentence that Mr. Pearson received. I didn't state earlier in my argument, but I wanted to state and just indicate to the court that his guideline range was 70 to 87 months, and he received a sentence of 144 months imprisonment. So, Your Honor, I believe that under the totality of the circumstances, the sentence was substantively unreasonable, and pursuant to the evidence submitted, again, the evidence that the court was presented with, we look at Pearson's admissions that has changed a plea and the statute of Pearson's conviction. The totality of the circumstances were as follows. Pearson's pleaded guilty to conspiracy to violate the Arms Export Control Act. As this court is aware, that act prohibits people from exporting certain materials that are on the United States munitions list, and that includes much more than firearm parts. It includes drones, aircraft, bombers, nerve agents, military intelligence. The maximum that someone can receive under that is 20 years. Mr. Pearson, when we again look at the concrete evidence in this case, exported 100 to 200 parts, firearm parts, into Mexico over a multi-year period. Can I ask one question? Curve Frisbee doctrine, you heard me ask about opposing counsel. Same judicial conscience test, similar? I just want your general take whether it's the same as opposing counsel. I believe it would be, Your Honor. Okay. So, Your Honor, for those reasons, we believe that when you look at those totality of the circumstances, a sentence of 144 months was just substantively unreasonable, particularly if you look at the cases that we cite where people convicted of the same, receive sentences of the range of 20 months to maybe at the high end, 60 months. Thank you, Ms. Depper. Thank you, Your Honor. The court also wishes to express its appreciation for your representation of Mr. Pearson under the Criminal Justice Act. Yes, Your Honor, it's a pleasure. As an opposing counsel. Thank you. Thank you. The court thanks both counsel for the argument provided to the court this morning, and we'll take the case under advisement.